**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CR-23-444-G-1** |
| | ) | |
| **WILLIAM KEITH DOUTHARD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>ORDER</u>**

Now before the Court is the Motion to Suppress (Doc. No. 34), filed through counsel by Defendant William Keith Douthard.  The Government has responded in opposition (Doc. No. 43).  On March 6, 2024, the Court conducted an evidentiary hearing on the Motion.  Defendant appeared personally and through Federal Public Defender J.P. Hill. The Government appeared through Assistant United States Attorney Wilson D. McGarry. Upon consideration of the evidence and the parties' arguments, the Court grants the Motion.

I.      *Background*

At the hearing, the Court heard the testimony of Officer Dustin Kellogg and Detective Jeffrey McCoy, both of the Lawton, Oklahoma Police Department, and Kelton Reese, an employee of the MySuites hotel in Lawton, Oklahoma.  Further, at the hearing and with its Response, the Government presented various exhibits, including recordings of body-camera footage of Lawton Police Department Officers Kellogg and Wattenbarger.

*See* Gov't's Resp. Ex. 3, Kellogg Footage (Doc. No. 43-3); *id.* Ex. 4, Wattenbarger Footage (Doc. No. 43-4).  The following facts are drawn from those materials and testimony.[1]

    Around 6:00 a.m. on March 12, 2023, an unknown person phoned the Lawton, Oklahoma, Police Department.  *See* Gov't Hr'g Ex. 1, at 2.  The anonymous informant stated that Tyaveon Hunter, a twenty-three-year-old black female, was staying with her boyfriend, "Willie Dees," a thirty-year-old black male, in Room 312 at the MySuites hotel located at 3 SE Interstate Drive.  *See id.* at 1-3.[2]  The informant stated that the couple possessed fentanyl pills, was driving a black Chevrolet Traverse SUV, and would be checking out at 11 a.m.  *See id.* at 2-4.  Police dispatch confirmed that Hunter had an outstanding warrant for her arrest.  *See id.* at 3-4.[3]

    Within minutes, Officers Dustin Kellogg, Taylor Wattenbarger, and Hunter Phillips arrived at the MySuites hotel to investigate.  The hotel clerk advised Officer Kellogg that Room 312 was unoccupied and that no one named Tyaveon Hunter was staying in the hotel.  Kellogg Footage at 00:02:00-00:03:05.  The clerk recognized Hunter's photograph

---

[1] The Court primarily relies on testimony from the hearing.  No specific citations are provided, however, because a transcript has not yet been prepared.

[2] 3 SE Interstate Drive is the address of the MySuites hotel.  MySuites shares a parking lot with another hotel.  Though the officers refer to the adjoining hotel as the Springhill Suites, the body-camera footage reflects that the adjoining hotel is the Fairfield Inn & Suites.  *See* Hr'g Ex. 1 at 4; Wattenbarger Footage at 00:03:00-00:04:00; Kellogg Footage at 00:26:00-00:27:00.

[3] Officer Kellogg testified that he had received an electronic wanted poster of Hunter by email prior to the March 12, 2023 arrest.  Also, the outstanding arrest warrant was publicly available through the state-court docket.  *See* Docket Sheet, *State v. Hunter*, CF-2022-639 (Comanche Cnty. Dist. Ct.); Crime Stoppers of SW Oklahoma, Facebook (Oct. 17, 2022), https://www.facebook.com/lawton.crimestoppers/posts/pfbid0r6jDuebwwRAFHrWHiAR R6A9jJKpXDM6eTL2Bpzu7VxDLY8GhsQ86iAcY8DN99KSRl.

and recalled seeing her going in and out of the hotel. *Id.* at 00:03:00-00:05:00; Wattenbarger Footage at 00:01:00-00:02:00.

Officer Kellogg sent Officers Phillips and Wattenbarger to check the license plate number on the black SUV in the parking lot. Wattenbarger Footage at 00:02:00-00:03:30. When doing so, Officer Phillips shined a flashlight in the SUV's rear window and observed a person sleeping inside. *Id.* at 00:03:30-00:05:00. The officers returned to the MySuites lobby as police dispatch returned the results of the license plate query as belonging to a Tiara Douthard. *Id.* at 00:05:30-00:06:00; Kellogg Footage at 00:07:00-00:08:00.

Unable to gather any additional information from the hotel clerk, the three officers went to Room 312 and knocked on the door, to no answer. Kellogg Footage at 00:10:00-00:14:30. The officers then knocked on the room next door. *Id.* at 00:14:30-00:18:00. A woman named Laura answered the door. *Id.* at 00:18:00-00:19:00. The officers tried a third room. *Id.* at 00:19:00-00:20:00. Another woman answered the door and the officers moved on. *Id.* The officers tried one last room. *Id.* at 00:21:00-00:22:00. A man named Dave answered the door and said he was staying with his family. *Id.*

Returning to the lobby, Officer Kellogg sent Officers Phillips and Wattenbarger to check the adjoining Fairfield Inn & Suites. *Id.* at 00:26:00-00:27:00. By this time, MySuites employee Kelton Reese had arrived at work. *See id.* The Fairfield clerk did not recognize Hunter's photograph and advised that no one under the name Hunter or Douthard was staying at that hotel. *Id.* at 00:27:50-00:29:00. After determining that Room 312 of the hotel was occupied, the officers proceeded upstairs. *Id.* at 00:28:50-00:30:00. The officers knocked on Room 312, and a man answered. *Id.* at 00:30:30-00:32:00. The guest

said that no one named Hunter was in his room. *Id.* The officers returned to the hotel lobby and confirmed with the hotel clerk that no one named "Willie Dees" was staying in the hotel. *Id.* at 00:33:00-00:35:00.

The three officers then met to wake the man sleeping in the black Chevrolet Traverse. Officer Kellogg knocked on the window of the SUV. *Id.* at 00:35:00-00:36:00. The man inside quickly arose, setting off the car alarm. *Id.* The man emerged from the vehicle and said he was a guest in Room 120 at the MySuites hotel. *Id.* at 00:36:00-00:37:00. Identifying himself as William Douthard, the man stated he was staying in the hotel with a female friend named Kay in Room 120. *Id.* at 00:36:00-00:37:00; Wattenbarger Footage at 00:36:00-00:37:00. Unprompted and without explanation, Douthard began walking away from the officers and the SUV and toward the hotel lobby. Wattenbarger Footage at 00:34:00-00:35:00. Along the way, he stated that he was sleeping in the SUV because he had been "arguing" with his companion.

As Officers Phillips and Wattenbarger spoke with Douthard in the MySuites lobby, Officer Kellogg walked down the hall to Room 120 and knocked on the door. Kellogg Footage at 00:38:45-00:40:00. Tyaveon Hunter opened the door. *Id.* Officer Kellogg asked if she was Tyaveon Hunter, which she denied. *Id.* She walked to the hotel lobby, stated that her name was Jayla Martin, and said she was the only person staying in the room. *Id.* at 00:39:00-00:41:00. Officer Wattenbarger asked Douthard if the woman was the female friend he was staying with, to which he replied, "That's her friend." Wattenbarger Footage at 00:38:00-00:39:00.

The officers then moved to arrest Hunter.  Officer Wattenbarger handcuffed Hunter as Officer Phillips took Douthard's arm.  Wattenbarger Footage at 00:38:00-00:39:00; Kellogg Footage at 00:40:00-00:41:00.  Douthard shoved the officers and fled.  Kellogg Footage at 00:41:00-00:42:00.  As Douthard fled, Hunter shouted, "Willie, don't do that daddy!"  Wattenbarger Footage at 00:38:50-00:39:00.  Hunter then attempted to run out of the hotel but was apprehended by Officer Wattenbarger.  *Id.* at 00:39:00-00:39:10.  Kellogg tazed Douthard, and he was apprehended.  Kellogg Footage at 00:41:00-00:42:00.  At this point, Hunter claimed not to know Douthard, asking Officer Wattenbarger "who is he, he wasn't even with me who is that?" and stating "[Room 120] is not even that man's room." Wattenbarger Footage at 00:39:00-00:40:10.  Douthard likewise claimed he did not know Hunter.  Kellogg Footage at 00:41:50-00:42:05.  Within six minutes, the two were secured in police cars.  *Id.* at 00:48:00-00:49:00.  By then, a fourth officer—Lieutenant Dustin Dye—had arrived on scene.

Officers Kellogg, Wattenbarger, and Dye convened in the parking lot to discuss what had happened.  *Id.* at 00:53:00-00:55:30.  MySuites employee Kelton Reese joined the three and asked how the hotel should proceed.  *Id.* at 00:54:10-00:55:00.  Officer Kellogg recalled that the anonymous informant had reported drugs in the room.  *Id.* at 00:54:30-00:55:00.  Officer Kellogg stated that without a warrant they could not enter and asked Reese to call the police if they found drugs in the room.  Wattenbarger Footage at 00:52:00-00:53:00.  The officers discussed how they could conduct a lawful search without a warrant.  *Id.* at 00:52:00-00:54:00.  Officer Dye suggested they could make sure no one else was in the room.  *Id.* at 00:52:30-00:54:00.  Officer Wattenbarger suggested that the

hotel could authorize them to enter the room, where they might find drugs in plain view. *Id.*  Officer Dye asked Reese if he knew whether anyone else was in the room, and Reese responded that he did not know.  *Id.*  Officer Dye asked Reese whether the hotel had a policy of allowing police to enter the room after arrest.  *Id.*  Reese responded that he did not know but said that he did not mind if the officers entered the room.  *Id.*

The officers entered Room 120.  *Id.* at 00:54:40.  By this point, the room had been unmonitored by police for approximately seventeen minutes.  Within one minute of entering, the officers confirmed that no one was in the room.  Officer Wattenbarger identified a marijuana cigarette in plain view.  *Id.* at 00:55:15-00:55:22.  Officer Kellogg asked, in response to Wattenbarger's discovery, "How far does that get us in the search?"  Kellogg Footage at 00:57:10-00:57:30.  Officer Kellogg visually inspected the contents of an open purse while another officer examined items on top of the coffee table.  *Id.* at 57:35-00:58:00.  Officer Kellogg radioed to other officers, directing that they ask Hunter if she wanted any of her bags given the large amount of cash inside of them.  *Id.* at 00:58:00-00:59:00.  An officer radioed back that Hunter said to leave them where they were.  *Id.*  Officer Kellogg picked up a paper from the desk that had Hunter's name written on it.  *Id.* at 00:59:00-00:59:30.

Officer Dye asked Reese how long the room was booked for.  *Id.* at 00:58:00-00:59:00.  Reese appears to have responded that he did not know but suggested one night.  *Id.*  Officer Dye asked about the hotel's policies for abandoned property disposal and whether they allowed others to retrieve property on behalf of guests.  *Id.*  Again, Reese did not know.  *Id.*  Officer Dye then phoned a police captain and reported that the search only

revealed marijuana and large amounts of cash in plain view.  *Id.* at 01:00:00-01:03:00.  In total, the officers were in the room for approximately seventeen minutes after entering.  *Id.* at 01:14:00.

As relayed in the warrant affidavit and testified to by an officer at the hearing, Hunter made two inculpatory statements after the "sweep" of Room 120.  While being transported to the police station, Hunter purportedly said: "I know y'all already found that shit."  Gov't's Resp. Ex. 1, Warrant Aff. (Doc. No. 34-1) at 8.[4]  While being booked at the station, an officer asked Hunter what she was being charged with, and she purportedly responded, "Probably trafficking."  *Id.*

Detective McCoy met with the officers to prepare the search warrant affidavit. Under a heading labeled "Investigative Findings," the affidavit states:

> On 3/12/23 Sgt Kellogg and PPO Wattenbarger received information from an anonymous tipster stating that there were individuals staying at the My Suites that were in possession of fentanyl and were possibly harboring a fugitive.  The tipster identified the female as Tyaveon Hunter.  The tipster stated that the individuals were driving a black SUV that was also parked at the hotel.  Upon arrival, hotel staff advised officers that there was a male asleep in a black SUV that was parked on the southside of the hotel.  The hotel staff stated that there was a male and Hunter that would go from the vehicle to room 120 and had been throughout the night.  At this time, officers went to make contact with the male that was asleep in the vehicle.  At this time, officers knocked on the window and observed a male to be sleeping in the back seat.  After knocking, the male woke up and quickly exited the vehicle, setting the alarm off in the process.  Once outside of the vehicle, the male identified himself as William Douthard and stated that he had a room at the My Suites.  Douthard stated that he was staying in room 120 and stated that he would show officers.  Douthard stated that he was staying with a friend that goes by K.  Officers stated that Douthard was walking in a manner

---

[4] Though both Officer Kellogg and Officer Wattenbarger were in the car with Hunter when this statement was allegedly made, the statement cannot be heard on either officer's body-camera footage.

as if he was trying to walk away from officers.  Once inside the lobby of the hotel, Douthard talked to the front desk telling them that he had a room and it was 120 and for the for them to tell the officers.  At this time, SGT Kellogg went and knocked on the door of room 120 which is located near the front desk.  At this time, SGT Kellogg stated that a female answered the door.  Sgt Kellogg asked if her name was Mrs. Hunter to which she stated "No, its Martin".  Sgt Kellogg stated that Martin than exited the room quickly and began to walk away from officers.  At this time, Sgt Kellogg walked with Martin to the lobby at which time PPO Wattenbarger was able to identify Martin by a photo as Tyaveon Hunter.  Officers knew Hunter had a felony warrant for her arrest and attempted to detain her.  At this time, Hunter became uncooperative with officers and had to be taken to the ground to place her in handcuffs.  Hunter would not comply with officers and after a brief struggle was placed in handcuffs.  At this time, Douthard began to act out as officers were trying to place Hunter in handcuffs.  Officers attempted to detain Douthard but he began to struggle with officers in attempts to run away.  Officers deployed their X26 tasers, striking Douthard with 4 darts.  At this time, Douthard was taken into custody without further incident.  Once both persons were secured officers conducted a protective sweep of the room to ensure that there were no other persons inside.  While doing so, officers observed there to be in plain sight marijuana in a clear plastic baggie lying on the coffee table.  There was also a large amount of cash lying on the table and in plain sight in a black purse.  At this time, the room was secured by officers pending a search warrant.

While on the way to the station, Hunter made a statement in the backseat of the patrol car stating "I know yall already found all that shit".  During the booking process with Hunter CO Kinyon asked Hunter what she was being charged with to which she made a spontaneous statement of "Probably trafficking".

*Id.* at 6-7.

Once a warrant was issued, a full search of the room and SUV revealed illegal drugs and firearms.  *See* Gov't Hr'g Exs. 11, 12, 16, 18.

II.    *Standard*

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under

8

the Fourth and Fifth Amendments.'" *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261-62 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982)). The proponent of a motion to suppress has the burden of showing "that his own rights were violated by the challenged search.'" *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (internal quotation marks omitted). The Government must then prove by a preponderance of the evidence that the search or seizure that occurred was lawful—e.g., that exigent circumstances or another exception to the warrant requirement existed or that the evidence sought to be suppressed was not the fruit of the poisonous tree. *See id.*; *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *see also United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021) ("Though the defendant bears the burden of proving whether and when the Fourth Amendment was implicated, the government then bears the burden of proving that its warrantless actions were justified by an exception." (alterations and internal quotation marks omitted)).

III.    *Discussion*

Defendant argues that the items seized in the search of Room 120 and the Chevrolet Traverse SUV should be suppressed because the warrantless search that supported Detective McCoy's probable cause determination was illegal and because the remaining contents of the search warrant affidavit are inadequate to independently support probable cause. *See* Def.'s Mot. at 4-8. The Government argues that the search warrant contained sufficient facts to support probable cause even without the warrantless search and,

alternatively, that the searches were justified by the inevitable discovery doctrine and the automobile exception to the warrant requirement.  *See* Gov't's Resp. at 5-15.

As a threshold matter, the Court notes that the Government does not challenge Defendant's standing to contest the search of either the hotel room or the SUV.  Fourth Amendment standing arguments are not jurisdictional and may be waived.  Because the Government has not questioned Defendant's standing, the Court finds that it has waived the issue.

### A. *Exigent Circumstances for Sweep of Hotel Room*

At the hearing, the Government argued—and Officer Kellogg and Detective McCoy testified—that the officers believed a domestic violence victim may have been in need of rescue in Room 120 following Defendants' arrest and, therefore, the officers were justified in "sweeping" Room 120.

The Court analyzes whether the officers' warrantless entry into and sweep of Room 120 were justified under the exigent circumstances doctrine.[5]  This doctrine allows for

---

[5] In its Response, the Government references the protective sweep doctrine.  "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  Such a search is constitutionally permissible if the officers had "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others."  *Id.* (alteration, citation, and internal quotation marks omitted).  The sweep must be limited to "spaces immediately adjoining the place of arrest from which an attack could be launched" and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  *Id.* at 334-36.  Where an arrest takes place outside of a dwelling, a protective sweep of the dwelling's interior may be permissible so long as the arrest officers "have reasonable grounds to believe that there are other persons present inside who might present a security risk."  *United States v. Banks*,

warrantless searches in circumstances such as "the hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police officers or other people inside or outside the home." *United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004). The test applied to determine whether the risk of personal danger created exigent circumstances is two-fold: "(1) [whether] the officers [had] an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others, and (2) [whether] the manner and scope of the search [was] reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). In considering the first prong, the Court is to "evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers." *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998).

The warrantless search here exceeded what is permitted. Considering the totality of the circumstances, the officers lacked an objectively reasonable basis to believe that a person was in Room 120 who was in need of assistance.[6] Hunter and Defendant were

---

884 F.3d 998, 1014 (10th Cir. 2018) (internal quotation marks omitted). Because the Government cites no evidence suggesting that a person posing a security risk was present in Room 120 during, much less after, the arrests of Douthard and Hunter, the protective sweep doctrine does not support the warrantless search.

[6] The Court has evaluated whether exigent circumstances permitted a warrantless sweep of the hotel room based on how the objective facts would be viewed by a reasonable officer. This is because "the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate[d] the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (internal quotation marks omitted); *see also Najar*, 451 F.3d at 718 (rejecting previous requirement for exigent circumstances that the search "not be motivated by an intent to arrest or seize evidence"). It should be noted, though, that the body-camera footage shows the officers strategizing how they could legally

arrested in the hotel lobby, several yards from Room 120.  The officers returned to sweep the room ten minutes after securing Hunter and Defendant in police cars, by which point the room had been unmonitored for approximately seventeen minutes.  Defendant's earlier statement that he had been arguing with his female companion is not a reasonable basis to believe that he had physically assaulted her and that she required immediate rescue.  And, in any event, by the time the officers searched Room 120 it was clear that Defendant's companion was in fact Hunter, who was detained in the police car.   Under these circumstances, the officers could not reasonably believe that a third person was in the room and was in need of rescue.  Accordingly, the warrantless search of Room 120 was not justified by the exigent circumstances doctrine.[7]

*B.  Whether Other Grounds Supply Probable Cause*

The Government argues that even if information about the contraband in Room 120 found during the warrantless search was excised from the warrant affidavit, that affidavit still supplied the probable cause necessary for the warrant's issuance.  *See* Gov't's Resp. at 6-9.

The Fourth Amendment requires a search warrant to be supported by probable cause.  *United States v. Duegaw*, 150 F. App'x 803, 805 (10th Cir. 2005).  "The probable-

---

conduct a warrantless search of Room 120 and at no point did any officer mention the possibility of a crime victim being in need of help.

[7] Even if a sweep of Room 120 was justified by exigent circumstances or the protection of officers, the search engaged in by the officers in this case plainly exceeded what would have been authorized, as the officers searched the room long after determining no one was there and searched in places (like the purse) a person could not be found.

cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). However, it "undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990). "A . . . judge's task in determining whether probable cause exists to support a search warrant is simply to make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Tuter*, 240 F.3d 1292, 1295 (10th Cir. 2001) (internal quotation marks omitted).

> 1. *The Anonymous Tip*

Whether a tip can establish probable cause depends on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge. *See id.* The tip need not satisfy all three factors as "deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Illinois v. Gates*, 462 U.S. 213, 233 (1983).

When a tip is anonymous, officers have no information about the veracity or historical reliability of the informant. *See Tuter*, 240 F.3d at 1297. In such circumstances, the reliability of the informant may only be established if officers independently corroborate information provided by the informant. *See id.* For this purpose, not just any corroboration will do. If the anonymous tip contains information about future behavior, officers may use this predictive information to test the informant's knowledge and credibility. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000). But a tipster's provision of

corroborated "non-predictive information . . . cannot be used to confirm the reliability of an anonymous informant." *Tuter*, 240 F.3d at 1297.  And a tipster's provision of corroborated publicly-known facts will not establish reliability. *See id*. at 272 (explaining that "[a]n accurate description of a subject's readily observable location and appearance" "does not show that the tipster has knowledge of concealed criminal activity").

Defendant cites to *United States v. Danhauer*, 229 F.3d 1002 (10th Cir. 2000), in support of his Motion. *See* Def.'s Mot. at 6-7.  In *Danhauer*, an agent received information from a confidential informant that Robbi and Dennis Danhauer were cooking methamphetamine in a garage located at the rear of their property and that a person called Casey was acting as a lookout in front of the home. *See Danhauer*, 229 F.3d at 1004.  The agent verified the informant's physical description of the Danhauer property, confirmed that the Danhauers lived there, observed the Danhauers going back and forth between the house and the garage, and discovered that the Danhauers had criminal drug convictions and outstanding arrest warrants. *See id.*  Based on these facts, the officer obtained a search warrant to search the property. *See id.*  The district court found, and the Tenth Circuit agreed, that the search warrant lacked probable cause. *See id.* at 1005-06.  The Court of Appeals found that the officer "neither established the veracity of the informant, nor obtained sufficient independent corroboration of the informant's information," as required to find the tipster reliable in reporting that there was methamphetamine at the Danhauer residence. *Id.* at 1006.

The facts in this case closely track those in *Danhauer*.  Defendant and Hunter's mere presence at a hotel with their SUV would have been observable to anyone on the street or

inside the hotel.  The fact that Hunter had an outstanding warrant for her arrest was a matter

of public knowledge and does not indicate that the informant possessed "inside knowledge"

of broader criminal activity.  *J.L.*, 529 U.S. at 270.  Although the tip did provide future

information—the 11 a.m. checkout time—the officers did not wait to test that information.

Accordingly, there are no facts here that support a conclusion that the anonymous tip was

reliable.  Therefore, information from that tip may not be considered in evaluating whether

there was probable cause sufficient to independently support the warrant to search Room

120 or the SUV.

       *2.  Hunter's Statements*

       The Government argues that Hunter's inculpatory statements made after her arrest

independently support probable cause.  *See* Gov't's Resp. at 7.  The Court finds that these

statements, made soon after and directly referencing the warrantless "sweep" of Room 120,

are not properly considered.

       In *United States v. Roof*, officers received an anonymous tip that fugitive Roof was

residing at a house in Albuquerque, New Mexico, was heavily armed, and was

manufacturing methamphetamine.  *See Roof*, 103 F. App'x 652, 654-55 (10th Cir. 2004).

Officers arrested Roof when he came to the door of the house and then conducted a

protective sweep of the house.  *Id.*  Roof observed the officers commence the protective

sweep and heard the police officers claiming to have found a methamphetamine lab inside,

at which point Roof admitted to cooking methamphetamine.  *Id.* at 661.  The district court

found, and the Tenth Circuit agreed, that the protective sweep was illegal because the

officers did not have a reasonable perception that the building harbored an individual

posing an immediate danger to them. *See id.* at 658. The Tenth Circuit found that Roof's statement should be suppressed as fruit of the poisonous tree, as the statement was not sufficiently attenuated from the illegal sweep as to dissipate its taint, because Roof only made the statement after knowing that the officers had searched the house. *See id.* at 661.

Here, Hunter made the referenced statements soon after being told by officers that they had entered Room 120 and looked inside her bag. *See* Kellogg Body-Camera Video at 00:58:00-00:59:00; Warrant Aff. at 7. Because Hunter's inculpatory statements are the direct product of her knowledge that the officers had searched Room 120 and its contents, and the Court has found that warrantless search to be illegal, those statements may not be considered in evaluating whether there was probable cause sufficient to independently support the warrant to search Room 120 or the SUV.

   3.  *Remaining Grounds*

After excising from the search warrant affidavit the information the Court has found to be improper for consideration—namely, the results of the illegal warrantless search, the information provided in the uncorroborated anonymous tip, and Hunter's inculpatory statements made in the wake of the illegal warrantless search—the following remains:

> ~~On 3/12/23 Sgt. Kellogg and PPO Wattenbarger received information~~ ~~from an anonymous tipster stating that there were individuals staying at the~~ ~~My Suites that were in possession of fentanyl and were possibly harboring a~~ ~~fugitive. The tipster identified the female as Tyaveon Hunter. The tipster~~ ~~stated that the individuals were driving a black SUV that was also parked at~~ ~~the hotel. Upon arrival, hotel staff advised officers that there was a male~~ ~~asleep in a black SUV that was parked on the southside of the hotel. The~~ ~~hotel staff stated that there was a male and Hunter that would go from the~~ ~~vehicle to room 120 and had been throughout the night. At this time,~~ officers went to make contact with the male that was asleep in the vehicle. At this time, officers knocked on the window and observed a male to be sleeping in

the back seat. After knocking, the male woke up and quickly exited the vehicle, setting the alarm off in the process. Once outside of the vehicle, the male identified himself as William Douthard and stated that he had a room at the My Suites. Douthard stated that he was staying in room 120 and stated that he would show officers. Douthard stated that he was staying with a friend that goes by K. Officers stated that Douthard was walking in a manner as if he was trying to walk away from officers. Once inside the lobby of the hotel, Douthard talked to the front desk telling them that he had a room and it was 120 and for the for them to tell the officers. At this time, SGT Kellogg went and knocked on the door of room 120 which is located near the front desk. At this time, SGT Kellogg stated that a female answered the door. Sgt Kellogg asked if her name was Mrs. Hunter to which she stated "No, its Martin". Sgt Kellogg stated that Martin than exited the room quickly and began to walk away from officers. At this time, Sgt Kellogg walked with Martin to the lobby at which time PPO Wattenbarger was able to identify Martin by a photo as Tyaveon Hunter. Officers knew Hunter had a felony warrant for her arrest and attempted to detain her. At this time, Hunter became uncooperative with officers and had to be taken to the ground to place her in handcuffs. Hunter would not comply with officers and after a brief struggle was placed in handcuffs. At this time, Douthard began to act out as officers were trying to place Hunter in handcuffs. Officers attempted to detain Douthard but he began to struggle with officers in attempts to run away. Officers deployed their X26 tasers, striking Douthard with 4 darts. At this time, Douthard was taken into custody without further incident. ~~Once both persons were secured officers conducted a protective sweep of the room to ensure that there were no other persons inside. While doing so, officers observed there to be in plain sight marijuana in a clear plastic baggie lying on the coffee table. There was also a large amount of cash lying on the table and in plain sight in a black purse. At this time, the room was secured by officers pending a search warrant. While on the way to the station, Hunter made a statement in the backseat of the patrol car stating "I know yall already found all that shit". During the booking process with Hunter CO Kinyon asked Hunter what she was being charged with to which she made a spontaneous statement of "Probably trafficking".~~

Warrant Aff. at 7.

The Court finds that this remaining information is insufficient to independently provide the probable cause needed to support a search warrant of Room 120 or of the SUV. While Defendant's evasive behavior, Hunter's provision of a false name, and the couple's

attempted flight are indicative of some kind of criminality, these facts do not constitute probable cause to believe that illegal drugs, illegal guns, or other evidence of reasonably suspected criminal activity were in Room 120 or the SUV.  This is particularly true given that much if not all of Defendant's and Hunter's conduct may be plausibly explained by the fact of the outstanding warrant for Hunter's arrest.

Accordingly, the Court concludes that the search warrant lacked probable cause.

### C.  Inevitable Discovery Doctrine

The Government argues that even if the search of the room was unlawful, the evidence may still be admitted under the inevitable discovery doctrine.  *See* Gov't's Resp. at 11-15.

Under this doctrine, unlawfully obtained evidence may be admitted if it "ultimately or inevitably would have been discovered by lawful means."  *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014) (internal quotation marks omitted).

> [A] court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means.  Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the Government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred.

*United States v. Souza*, 223 F.3d 1197, 1205 (10th Cir. 2000).  "The government bears the burden of proving by a preponderance of the evidence that the evidence would have been discovered without the Fourth Amendment violation."  *Christy*, 739 F.3d at 540.

The Government first argues that hotel staff would have lawfully discovered the drugs in Room 120 after Defendant's and Hunter's arrest and would have reported that discovery to the police. *See* Gov't's Resp. at 11-12. This assumes that cleaning staff or other hotel personnel would have entered Room 120 before Defendant, Hunter, or one of their associates returned to the hotel to retrieve their belongings. The probability of discovery therefore depends on, among other factors, the length of Defendant's reservation, how often the hotel provided unrequested housekeeping, and the hotel's policy on allowing agents of guests to access their rooms. At the hearing, the Government conceded that it did not know the length of Defendant's reservation or any specific details about the hotel's policies. The undersigned specifically asked the Government's counsel to provide this information, and counsel stated that the Government would issue a subpoena to the hotel and provide the information to the Court. Instead, the Government submitted a document, dated March 8, 2024, titled "Confirmation Letter" that appears to be a sample room reservation receipt. The Government also submitted what appears to be an undated photograph of a notice document, stating "CHECK-OUT TIME IS 11:00AM" and reciting certain Oklahoma state laws governing hotels and guests. These submissions do not provide information adequate to establish inevitable discovery by hotel staff. Without knowing the length of Defendant's reservation, whether the hotel would have allowed others to enter the room on behalf of Defendant, or whether the hotel would have provided housekeeping on a particular date and time, the Court cannot confidently conclude that the items would have been inevitably discovered by hotel staff. Accordingly, the Court finds that the Government has failed to establish by the preponderance of the evidence that hotel

staff would have inevitably discovered and alerted law enforcement to the contraband in Room 120.

Next, the Government argues that prior to conducting the "sweep" of Room 120, officers could have sought and would have obtained a warrant to search the room. *See* Gov't's Mot. at 13-14. This argument is largely based on information the Court has found to be improperly considered in evaluating probable cause. Therefore, the Court does not have "a high level of confidence that the warrant in fact would have been issued" and the evidence thereby discovered. *Souza*, 223 F.3d at 1205.

### D. Automobile Exception

Finally, the Government argues that its search of the SUV was proper even if there was not a valid warrant because the automobile exception to the warrant requirement permitted a warrantless search. *See* Gov't's Resp. at 9-10.

Pursuant to this exception, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, the warrant requirement does not apply to a search of any area of the vehicle in which the evidence might be found." *United States v. Polly*, 630 F.3d 991, 999 (10th Cir. 2011) (internal quotation marks omitted); *see also United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). The automobile exception to the Fourth Amendment's warrant requirement "allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile" and "(2) the police have probable cause for the search." *United States v. Lindsey*,

482 F.3d 1285, 1293 (11th Cir. 2007); *accord United States v. Medina-Gonzalez*, 437 F. App'x 714, 718 (10th Cir. 2011).

There is no dispute that Defendant's vehicle was operational and thus "readily mobile." *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). As to the second requirement, the Government argues that the facts recounted above, in addition to Detective McCoy's knowledge of Defendant's history of drug and firearm convictions, provided the officers with probable cause to search the vehicle. *See* Gov't's Resp. at 9-10.

The Court has already concluded that, after excising from the search warrant affidavit the information not properly considered—the results of the illegal warrantless search, the information provided in the uncorroborated anonymous tip, and Hunter's inculpatory statements made in the wake of the illegal warrantless search—the remaining information is not sufficient to independently support probable cause to search Room 120 or the SUV. Adding Defendant's criminal history to the analysis does nothing more to establish probable cause to search the SUV. Criminal history alone does not support a finding of probable cause, though criminal history combined with other factors may be sufficient. *United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004). Here, the facts relevant to the SUV are that Defendant was found sleeping in the SUV while it was parked at a hotel and then, when woken by police, walked to the lobby somewhat evasively. Because the information presented, even along with Defendant's criminal history, does not support a finding of probable cause that contraband would be found inside of the SUV, the automobile exception to the warrant requirement is inapplicable.

### E.  Good-Faith Exception

Pursuant to the good-faith exception to the exclusionary rule, "if a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief." *United States v. Chambers*, 882 F.3d 1305, 1310 (10th Cir. 2018) (internal quotation marks omitted).  It is the Government's burden to prove that officers' reliance on a warrant was objectively reasonable, though the Supreme Court has noted that the Government "should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *United States v. Leon*, 468 U.S. 897, 924 (1984).  Here, the Government has not asserted that the good-faith exception applies—in its Response or at the hearing—or attempted to prove the necessary predicate facts.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. No. 34) is GRANTED.

IT IS SO ORDERED this 5th day of August, 2024.

CHARLES B. GOODWIN
United States District Judge